Scott Michaelman, Public Citizen, and I'm representing the Schachter Objectors today. I'll talk for five minutes about the illegality of the settlement under state minors' privacy laws, including any COPPA or First Amendment responses that come up to that. Then Professor Bob Thelmuth of the Children's Advocacy Institute will discuss the California Family Code, California Constitution, SIPRE, and attorney's fees issues. And finally, Aaron Ziegler of Corringtillery, whom you just heard from, will discuss the conflict of interest point between the minor subclass and the remainder of the class. We'll each do that for five minutes, and we'd like to reserve five minutes for rebuttal. Okay, and keep track of your time. Thank you, Your Honor. I'm going to address a different problem than the California Family Code you just heard about. As no one disputes, a district court cannot approve a settlement that authorizes clearly illegal conduct. This is such a settlement on its face because it violates the laws of seven states, including California. Using a minor's likeness without parental consent is illegal in the states of California, Florida, New York, Oklahoma, Tennessee, Virginia, and Wisconsin. I get that under the terms of the settlement, the relationship between Facebook and the children or among Facebook, the children and the parents is now different. So please talk to me or talk to us about what's going on under the settlement in terms of the involvement of the parents as distinct from what happened before the settlement. Because we're talking about illegal conduct going forward. Yes, Your Honor, absolutely. It's illegal conduct going forward, and the places to look for that are ER 31 and 32 of the Schachter excerpts. There are a couple of changes. The main one is that Facebook's terms will include that minors represent that their parents consent to the use of their likeness in ads. Not that their parents did consent, not that their parents have to be on there necessarily, just that the child represents by signing up for Facebook. Then there are a couple of provisions for certain safeguards. But those safeguards are in the nature of an opt-out. Do you require the safeguards? Yes, Your Honor. There are two safeguards. First, Facebook will not use a minor's images in ads if the minor affirmatively takes the step to indicate his or her parents are not on Facebook. So again, the minor must affirmatively do that for the minor to be out of the ads. And then otherwise, there's a complicated process in which the parent and the minor must be on Facebook. They must each confirm their relationship with each other. And only then may the parent, by a further affirmative step, take the step to opt the child out of sponsorship. Can I ask a question about, to go back a minute, in terms of, I understand what, and you should finish with your explication. No, no, that's it, Your Honor. There's two safeguards. Actually, if I could just throw in one other thing. Even Facebook and class counsel, in their briefs, cannot say, and you just heard Mr. Levin say, there's no way for the kids to get entirely out of this without the affirmative actions taken by the kids or by the parents and the kids. So the only safeguard they're truly relying on is the child's representation of parental consent. And that's just not the same thing as actual parental consent. Okay. The provisions that you're relying on is making this quote illegal. What do they do? They basically say that there could be liability if you do this, right? That's right. And in some cases, criminal. You don't get fines. It is criminal in three of the states, Your Honor, New York, Oklahoma, and Tennessee, it's a misdemeanor to use the child's likeness for advertising without her parents' consent. Well, so is this provision going to officiate that? It will, Your Honor, because now Facebook is going to use, on a going forward basis, minor images for advertising. Fine. And if somebody in Maryland or wherever wants to prosecute them, they'll prosecute them. Well, I think that's problematic for a couple reasons. First of all, there's a provision in the settlement that it constitutes a complete defense. That's 7.16. Well, not to the world. I mean, you can't buy Maryland or I don't know which states they were, but whichever states they are. Well, yes, Your Honor, but that brings us back to the rationale for why you can't approve settlements that authorize unlawful conduct. Imagine New York, one of the states. There's a prosecution. One of our clients is from New York, Margaret Becker. Margaret Becker's daughter, her images are used in this manner. She goes to her local prosecutor. Her local prosecutor says, yes, I'm going after this. I'm going to enforce New York law. Then the New York court has to deal with the fact that the district court and this court basically blessed this agreement. It basically said, this is okay. We didn't do it. They didn't do it. All you were doing was settling a lawsuit. It doesn't bind anybody to anything with regard to the future. I don't understand the problem. The problem is that it creates a conflict between what might happen in another court with these other laws and the enforcement of those laws and the decree of a federal court enforcing this settlement. All the federal court did was say, if you want to settle the lawsuit that way, go ahead. I'm sorry, Your Honor. All the federal court did was say, if you want to settle this lawsuit this way, go ahead. They didn't say it was legal or illegal. That's the whole point of the settlement. But they had to find that it was fair, reasonable, and adequate under Rule 23. And part of that, many courts, many circuits have held, is the requirement of legality. This is what I don't understand. I mean, the obvious problem with this point of view is that it's going to put an enormous crimp in ever settling a lawsuit because somebody is claiming that what you're doing is illegal or there wouldn't have been a lawsuit. Therefore, the judge can't approve a settlement without deciding the merits of the lawsuit. But it's not illegality as to the past conduct, Your Honor. It's illegality as to the future conduct. All right. So you can't approve a settlement that has an injunction. That has future conduct, but only an illegal injunction. I'd point out that we're citing cases going back as far as 1980 for this proposition, or actually in the 1970s for this proposition. And we don't see a problem that lawsuits are not the class actions aren't being settled. But this is a longstanding rule. I can see that you're terribly nervous about your co-counsel back there who want to talk. Don't worry. We're not going to penalize them for us asking you questions. But here's a question I have. I do appreciate that, Your Honor. The settlement here instructs Facebook to do certain things that bring it more closely into compliance than it previously had been. So I don't know how this cuts with respect to authorizing illegal conduct. It requires certain conduct that, reading it your way, brings it closer into compliance, and apparently is in compliance now with the criminal laws of every state in the union but three. But I don't see the injunction as insulating Facebook from criminal prosecution in those things. It just says, hey, here's some things you better do. And instead of saying, here's some things you better do that are going to violate the law, everything that they do is in the direction of complying. So how do you respond to that? The key response, Your Honor, lies in the federal court's stamp of approval. I think that's going to carry a lot of weight. Stamp of approval in what sense? Because they – Here's what you have to do at a minimum in order to comply with this injunction. It doesn't say, and you will be protected from criminal lawsuits in states where this is illegal. But what it says is that what they were doing before, you know, the legality of that is not at issue. What's at issue is that the federal court has now said this settlement is fair, reasonable, adequate, and essentially legal. I'm not sure it said that, and I'm very sure that it does not bind a New York prosecutor. Well, I think a New York court addressing this problem would look to this settlement, and Facebook would certainly say, well, we were just doing what the court said we could do. Do you really think that a New York court is going to dismiss a misdemeanor prosecution because of what the Ninth Circuit says? I think that Facebook would raise this settlement. In a civil case? In a civil case or in a criminal case, they would look to this court and they would say, you know, this court seemed to think this was okay. And Facebook will say, well, we're just relying on what the court told us we could do. I'm speaking not for my fellow panel members, but I will say, and you can quote me if you like or whoever you want, but this is the one where we get the criminal prosecution going forward. I don't regard this as preventing New York from entering into a criminal prosecution. Amen. Well, or me. It just doesn't seem relevant, and it doesn't seem relevant to any future lawsuit with regard to anything in the U.S. complaint about what they're doing now. Well, actually, to the extent that the settlement releases future claims, it is relevant to civil lawsuits, and it binds even people who are not members of Facebook in this way. Because if I'm a parent and my child uses Facebook, and I'm not on Facebook, but my child is, and my child uses Facebook and my child represents that I consent because she didn't see the disclosure or whatever, and then Facebook uses her images in ads, I can't sue because my child is bound by the settlement, and therefore my rights are obstructed, even though I never agreed to the settlement, I wasn't a part of this class, I wasn't on Facebook, but my child is on Facebook, and she is bound by the release in this settlement and the provision in 7.16 that this agreement constitutes a complete defense. So Facebook would have a defense to my suit if I'm a Virginia parent saying, you're using my child's images in advertisements, and that's unlawful. Facebook would waive this settlement. The class council says they won't, but Facebook didn't say that. Facebook would waive this settlement and say, this gets us off the hook, even as to me, a non-Facebook user, a non-class member. That's the sort of mischief that occurs when you have a district court approval. And even as to things that happen after the settlement. Now, the release is retroactive, Your Honor, but at ER page 48, 7.16 says, this settlement agreement may be pled as a full and complete defense to, and may be used as the basis for an injunction against any action, suit, or other proceeding may be instituted, prosecuted, or attempted in breach of or contrary to this settlement. So the settlement itself says at ER 48. I'm trying to understand whether the settlement constitutes a waiver of future, when you say future claims, are they future claims with respect to future time periods? Well, yes, because the settlement is about what Facebook will do going forward. Facebook, you know, consistently with the settlement, Facebook is going to continue to use kids in ads with this representation of parental consent, and the settlement itself provides that it is a complete defense to that future civil suit. So for that reason, it was inappropriate for the district court to approve the settlement. It will gum up the enforcement of these statutes, civilly at least, in the future. And I will now protect you from your co-counsel. And would you put the clock in 15 minutes, please? Thank you, Judge Fletcher. Thank you, Your Honor. Your Honor, I just want to mention off my script that in terms of 6701C, you're talking about— I'm not giving you your name. I'm sorry. Robert Fellmuth from the Children's Advocacy Institute on behalf of the Depot family and in the interest of 10 million children. Your Honors, just as an aside, 6701C discussed, is it agency, is it delegation? You're not talking about alienating a bicycle to someone who then will sell it to a third party. You're talking about an ongoing relationship where they will come back to you and your assets and take them and reshuffle them and sell them to a third party and then to another third party and then to another third party. The fact that it's a greedy agent and it's taking almost all the money doesn't mean it's not an agency. That's just off script. I apologize. That's not part of my territory. I would ask the Court's indulgence to give me three minutes because I have things to say that create a whole greater than the sum of the parts. I just need three minutes. Well, I thought you had five. Well, if I get it, we'll see. Am I misunderstanding you? I think he doesn't want us to ask. That's not part of the deal. I want to be able to say—I want to be able to go for three minutes. Okay, fire away. I'll keep my mouth shut. There are six unusual red flags which demark this blanket waiver as the most profound child privacy incursion in my 25 years of child advocacy. And these six red flags fly beyond the other issues that have been raised. One, you have in this case an extraordinary reverse attorney fee provision, leading Facebook Counsel to openly warn class reps at deposition that it has the right to fees if the case is not settled and they lose a risk of millions and rather profound personal consequences. Two, the lead class rep frailly withdrew and has protested, as has the major side prey recipient, eschewing hundreds of thousands and protesting this blanket waiver. Three, the trial court and teen subclass counsel openly question any difference between a 17-year-old and a 25-year-old. Four, there has been basic contentions by Facebook with sympathetic sentiments from the court below that the cop of federal law pertaining to children 0 to 12 supersedes and eliminates all state and common law privacy protections for teens over that age. Now with amicus briefs to the contrary from the California Attorney General and the Federal Trade Commission, which administers the statute. Five, there are amicus briefs signed by some 20 respected public interest entities, including the American Academy of Pediatrics. Six, the case raises privacy implications vis-a-vis the Internet. A posting of your thoughts, photos, whatever on Facebook may be copied and pasted by any recipient into the Internet and the audience getting it cannot be tracked to rebut or apologize and has stayed accessible through search engines for decades. It is a unique publicity domain. Now, I think you're getting wrong what Facebook is doing here. Facebook is not modifying anything. Facebook is not making things better at all. Nothing would be better. We have a new blanket waiver. Is it fair, adequate, and reasonable? It consists of four sentences to be added to the five-page adhesive legal terms and conditions already checked off in its previous version by over 10 million teens. The first three provide that Facebook may take any information posted by a child, rearrange it for money received only by Facebook, launch it into this public domain. Now, there are three illusory fig leaves, and that's what you're looking at, unfortunately, as non-illusory, one that it can be limited in reach by the teen. If I may, you have no idea what we think about any of this, so I don't think you should be accusing us of... Pardon? You're accusing us of what you think we think. I don't think that's a good idea. No, I'm talking about them. I'm talking about them. Not you. Them. Facebook claims... I'm saying they're illusory. Facebook claims they're actual improvements. One, that it can be limited in reach by the teen. Two, that the teen can notify Facebook that parents are not subscribers, which would remove them. Or three, that the parents can affirmatively act to remove the children from this intervention, but few teens and fewer parents, you have to understand, will know of any of this. None will see or know in advance about any of these capture and retransmissions when they occur. They just happen. You don't know about it. They'll happen again. You don't know about it. No consent by the parent. No permission. No even notice. Excuse me. Okay. Under what rubric are you arguing this? That this is not a fair and reasonable settlement? That it's an illegal settlement? I'm getting to it. I'm getting to that. I don't usually appreciate people just reading off. Okay. I understand that. May I beg your indulgence to read one sentence of the change, and then I'll tell you why it's illegal. The sentence is, quote, if you are under the age of 18 or under any other applicable age of authority, you represent that at least one of your parents or legal guardians has also agreed to the terms of this section in the use of your name, profile, picture, content, and information on your behalf, end quote. Absolute statement, that's number four on the list. Now, here are the flaws. You've used your five minutes. If you'd like to cut into the end, and we've not really been taking them up with questions. If you'd like another couple of minutes, go ahead. I just want to point out the key flaw here. If I have to get down to one, it's that California law applies. We have in California Article I, Section I of the California Constitution creating an inalienable right of privacy. That right applies not only to state actors, it applies to private actors as well. It's an unusual provision. It's been so interpreted. It also applies to teens. There are 50 citations I can give you. Unfortunately, I only put two in the brief, but this is a whole area of the law that was not considered below. It was not looked at. How can you not look at, if state law applies, the constitutional provision that guarantees privacy to teens that has 50, 60, 70 precedents? Not mentioned anywhere. Someone's got to look at that. I'm finished. Thank you, Your Honors. May it please the Court. We know your name, but just for the record. Aaron Ziegler on behalf of the objectors. Your Honor, this settlement has an Ortiz v. Amchem problem. There's a conflict of interest between the subclass of the minors and the adults, and as a result, it doesn't satisfy Rule 23a's requirement for adequacy. That's our objection. The Supreme Court in Ortiz looked at a settlement there that had two groups of claims that were worth different values, and the Supreme Court held that in such a situation, the class needed separate representation, including separate counsel, and if that didn't exist, Rule 23a wasn't met and the settlement needed to be rejected. The conflict in Amchem was much more pronounced than here. In Amchem, it was current versus future claimants. In Ortiz, the difference was between whether or not you had claimants who were covered by insurance and claimants who were not covered by insurance. So there you had a difference of value of the claim, not extent of the claim, if that makes sense. Here, it's much the same. You have adult claims who say, we didn't consent to these terms and conditions because they came after we joined the site or before, and you have children who have different claims. Under Section 3344, which is what the Franklin case is prosecuted under, it requires parental consent for use of a minor's name and likeness. So those minors have this special defense, which is to say, you didn't get parental consent. You might have gotten my consent, but you didn't get my parents' consent. That makes their claims substantively different than the claims of the adults. Now, there's a value to that. What that value is, we don't know, and we'll never know, because there was not special counsel for this subclass of minors. If we were to agree with you about this, what would the consequence be? The consequence is that the entire agreement is reconsidered. In other words, the entire agreement then collapses. Is that right? Yes, Your Honor. Adequacy, a failure of adequacy, destroys the certification. Not only with respect to the children, though. It just falls apart altogether. Yes, Your Honor. And that was the difficulty that the Supreme Court had in both Ortiz and Amkin. They liked those settlements. They saw the asbestos problem as a huge problem for society and thought both of those settlements did great value to society, but yet were troubled by the lack of adequate representation. And when you look at the concurrences and the dissents, you see that the justices struggled with that, but yet still found that Rule 23A couldn't be compromised. I guess the hard question here is, at what level of sort of disaggregation between potential subclasses is separate representation required? In many settlements, there will be somewhat differently situated people, and the settlements will deal with that. So the question is, what kind of differences require subclasses and separate representation? Yes, Your Honor, and that's a difficult question that a number of courts have struggled with, the Second Circuit and the Third Circuit recently. The answer to that that the Second Circuit has come to is when the conflict goes right to the heart of the matter. If you were to apply that test here, it would be fairly straightforward. The heart of the matter, the heart of the Fraley case, is consent. Minors have stronger claims on consent than adults do. It goes straight to the heart. And different causes of action as well. And a different cause of action as well, Your Honor. As I look at both Amkham and Ortiz, what I think the Court was primarily concerned about was not merely that the interests were different, but they were even antithetical. That is to say that to the extent money went to one class, it was going to be taken away from or not given to the other class. We don't have that here, even though we... I absolutely take your point that we have different interests. Can you help me with this? I can. My time has expired. We do have that issue here. There was a capped fund of $20 million. $10 million was made available to the class. There were 123 million members. Ten million of those were minors. To the extent... There was a fight for that money, for that $10 million. How much of it was going to go to the minors? How much of it was going to go to the adults? To the extent that more money went to the... Of course, on that level, it's a very different kind of case because the money is peanuts no matter who's going to get it, and it's not money for actual... connected to the actual injury, let's put it that way. I mean, in the cases like the ones in the Supreme Court, you had injured people who are going to get a substantial amount of money and therefore are competing for the funds matter. I mean, here, if they're not competing, people will get $2 more and they'll also get $2 less, but it's not really what the case is about. Indeed, it's not... I mean, here, in terms of the arguments, the concerns about the way the settlement deals with the children deal primarily with the injunction and not with the money. So the money doesn't seem to be the point. Do you agree with that? This is not like those cases for that reason. So the question is, with respect to the injunction, what did matter? How would the separate representation have mattered? How would separate... It's impossible to know what would have happened had there been separate representation. I understand that, but we need to be able to make some judgment about which side of the line this falls on as to, quote, the heart of the matter or whatever test we're going to use. Right. So you can see Mr. Feldman's argument about the inadequacy of the injunctive relief. I would agree with that. I would add further that it's a matter of this record that Facebook has stopped the sponsored stories practice, so the injunctive relief is absolutely meaningless. Since it doesn't do that anymore, you can find that in Facebook's brief in a footnote. So the injunctive relief itself is zero. So you have the adults and the minors both getting $10 here. That's the exact same amount when they had different claims. That's an Ortiz problem. $10. It was $10 at some point. I'm sorry? You said $10. It's been bumped up to $15. You're right, Your Honor. Why does the fact that an adult qualified for $15 prejudice a child? It doesn't, Your Honor. Then why is there a conflict between them? There are different qualifications for the defense, consent versus parent's defense. I understand that. But why is it antithetical or why are they enemies of each other? The clearest case of this is the Second Circuit's decision in literary works. Don't tell me about the case. Tell me about this case. Okay. How does it harm a child that an adult makes a claim? I wouldn't say that that in and of itself. How does an adult making a claim hurt the child? To the extent that there were 100 million adults, to the extent that they made a claim, it exhausted the fund, which made less money available for the minors. And to the extent that if more than 2% made a claim, there was no money available for anyone. That was a problem that was looked at in the literary works case. And the question the court there asked was, look, we've got two claims here that are of different value. We know they're of different value. We can't tell you how much this one's worth because they didn't have representation, so no one was fighting for them. Yeah, but I want to sort of merge Judge Baya's question and Judge Berzon's question. To the extent that there's a serious objection to what happened with respect to the children, it's not the amount of money. It is the deficiency or alleged deficiency in the injunctive relief. So how is there a conflict between the parents and the children with respect to the injunctive relief that your side is alleging is insufficient for the children? Right. The allegation, Your Honor, is that the injunctive relief is illusory and insufficient for the minors. I understand that, but how is the adult class and their interest sufficiently antagonistic to the child class with respect to injunction that we should have subclasses? The point is that they were looking for different things. The adults were only concerned with money due to their weaker claims, and the minors who were also concerned with money. Yeah, but in order to have a subclass required here as distinct from sort of optional, you've got to have something going on here so that there's the potential for the presence of the adults in the class, the potential for selling the children down the river, and I'm not sure I understand that yet. I understand the distinct interests, but I have trouble seeing how the conflict between the parents getting more money, excuse me, the adults getting more money, is really going to have much to do with the effectiveness of the injunctive relief. Can you help me with that? Sure. Your Honor, I think the response to that is that the adults weren't concerned with injunctive relief. The injunctive relief does nothing for the adults. The minors were concerned about injunctive relief because they can't consent legally, so the injunctive relief is required for them. Okay, got it. Okay, let's hear from the other side. We've taken you over time, but we will give you a chance to rebut. Good morning, Your Honor. Kristen Myles of Munger, Tolleson, Olson. Please keep your voice up and articulate for the old deaf people who are up here on the bench, speaking only for myself. I will try to do so, Your Honor. Thank you. So I'm here on behalf of Facebook, Defendant and Appellee, and I'm here on behalf of the Department of Justice, and also at counsel table is counsel for plaintiffs. So we will attempt to divide our time as the court's questions allow so that counsel for the plaintiff can also speak and answer the court's questions. Are you going to divide it up 10-10? How do you want to do this? We set a rough approximation of 13-7. You're 13 and they're 7? But again, if the court has more questions for plaintiffs or more questions for me, we're flexible on our side. Judge Seaborg did not abuse his considerable discretion in approving this settlement. The settlement was a reasonable arm's length negotiation with a retired magistrate judge, and the parties reached terms after litigating issues through a motion to dismiss, extensive discovery. How do you respond to the arguments that this settlement, with respect to the future, sells the children down the river? We don't believe the settlement does, Your Honor. There is a monetary payment to which the children were entitled. I'm talking about the future. I'm not talking about the monetary payment. The injunctive relief, Your Honor, benefits the minor class. Obviously, the major issue in this case in the claims brought on behalf of the minors or by the minors was that their name and likeness were used without their parent's consent. I mean, this agreement doesn't do – in the real world, it is unlikely that that's going to be changed by this agreement. Is that right? By this agreement? Yes. What the agreement does, it attempts – obviously – I know what it does, but – I mean, and your answer may be there's no other way to do it. But in terms of – if you take literally the notion that they're not supposed to do this without their parent's consent, I gather all they have to do is check a box saying, I have my parent's consent. Is that right? That's what the – that's one of the provisions the agreement has in it. It also has a – And that, under the agreement, is sufficient to allow Facebook to go forward, correct? The agreement also contains more specific consent provisions in 2.1a of the injunctive relief provisions in the settlement. It enhances the disclosure and consent provision, which applies to all users, including minors. It has tools by which the parents can access and control their – the use of their children's – If they're Facebook users. Content – pardon me? If the parents are Facebook users. Parents, whether they're on Facebook or not, have a tool under 2.1b to view and control sponsored stories content to determine what the parents will say is eligible to be used in sponsored stories. Now, assuming for a moment that I'm a well-informed parent, and I know how Facebook works, and I know about this provision, can I go onto Facebook and say, Facebook has no permission whatsoever to engage in this practice with respect to my child's likes, dislikes, and so on? The parent can control content that's eligible for Facebook under 2.1b. Yeah, but I'm asking, what can I, as the parent, control? Can I forbid Facebook entirely from engaging in the practice that has here been challenged in this lawsuit? Certainly, the parent can – let me just explain – let me just go back and talk about what the practice is that's being addressed in sponsored stories. And it is – the minor likes a page or a piece of content that's eligible for sponsored stories. That like, it might be Hillary Clinton's campaign. It might be someone else's campaign. It might be Coca-Cola. The minor likes that, and that gets published automatically to the user's friends. So that like is not challenged here. That's the user's ability to say, I like Coke, and that immediately gets put to their friends. And Facebook makes no money from that. That is to say, they get no money from advertisers from Coke or anything for that. Is that correct? Facebook gets money from advertisers to have their advertising presented on Facebook in general. So the fact that a like, a person can like that content, is part of the package that is available to an advertiser when they buy advertising on Facebook. In other words – Let's go back a minute to the incentive. If the child checks this box that says, I have my parents' consent, does any of the rest of this operate? I'm sorry. Does any of the rest of it operate? I.e., can the parent then nonetheless negate the use? The parent can still go to the safety, the www.facebook.com backslash safety page that is referenced in 2.1B of the settlement agreement and control what of the minor's postings will be eligible to appear in sponsored stories. That is still a tool that is available, whether or not the minor represents that his or her parents have consented. Now can I come back to the question I asked? Yes. If the parent knows about this and makes the effort to go in here and say, I want to control what of my child's use goes on these sponsored stories, can the parent forbid entirely the use of this in sponsored stories? Is that a yes or no? There's no mechanism. No. I think the answer is no. There's no mechanism where the parent can uncheck a sponsored story box. That's not an option that's given to the parent. So if the parent takes these affirmative steps and does everything the parent is allowed to do under the terms of the settlement agreement, the parent is not allowed to forbid Facebook to do sponsored stories for the child in all the sponsored stories? I believe the closest I can answer that, Your Honor, is the tool in 2.1B could be used in that fashion. But the tool in 2.1B doesn't mention children, right? It doesn't directly address the relationship between the children and the adults. Under parental controls, I misspoke, it's C3, not 2, not B. I apologize. But there's an accessible link in the safety page of Facebook that enables parents to prevent the names and likenesses of their minor children from appearing in sponsored stories. That is what the settlement says. In any sponsored story? Yes. Okay. Because that was not the answer you gave me before, but you just changed your answer? Well, I didn't mean to. If I misspoke, I'm sorry. I wasn't quoting the language. Now I am. But I was trying to say the same thing. The parents can disable the content that can be used in sponsored stories for their child. I'm absolutely not trying to say something unclear. I'll just quote the language of the settlement. But as soon as you quote that language, I don't understand it fully. It says disable the content in sponsored stories. Well, what do you mean by content? Facebook will use the tool to enable parents to also prevent the names and likenesses of their minor children from appearing in sponsored stories. And I'm sorry, I did not mean to be evasive. I just didn't have the language in front of me. I'm not charging with deliberate evasiveness. We're just trying to get at what the actual understanding is. Now that tool also exists for other forms of advertising beyond sponsored stories. To deal with the very obvious real-world problem, anybody with kids or any kids with parents knows the following. Kids will not read all the fine grain. They will click just as adults will. And kids will often represent, my mom says it's okay when mom has said no such thing. We also know that parents are not necessarily going to be adept at using Facebook. They don't know they have this option. I anticipate the likely outcome of this is that there's going to be a fairly steady continuation in a very high percentage of the prior use of these sponsored ads for minors. So what do I do with that? Well, let me go back, Your Honor, to the underlying lawsuit. Whether the plaintiffs could have prevailed in their underlying claims is a very open question, as Judge Seaborg outlined. There were a number of problems with whether plaintiffs could recover on the state of facts that Your Honor just outlined. But does that give rise to an actionable claim by the minor? There were substantial issues of both implied consent and actual consent through the language of the existing SRR. There was evidence developed in discovery that many of the parents knew that their children were on Facebook and knew exactly what sponsored stories was and nonetheless allowed their children to continue using Facebook, which is evidence of implied consent, of which there was a great deal of evidence in the record. In addition, there's the issue of injury, which Judge Koh made clear at the motion-to-dismiss stage, is an element of this claim. How were the children injured? How were the parents injured? How does that get quantified? Can the plaintiffs prove a right to recovery under the statute? I'm not talking about the $15. I'm talking about the prospective, the injunctive relief. I'm trying to figure out how much protection that gives realistically to the children's privacy interest of not having this being done without parental consent. My instinct is that the involvement of most parents, either knowingly or even by inference or even by suspicion, is going to be pretty minimal. I have to say, I have no evidence. I've got kids of my own, and I understand how little I understand about Facebook. Well, if you have parents that actively use Facebook, as many of the parents involved here did, they understand what Sponsored Stories is and how the names were being used, and there was one parent whose deposition was taken who helped his child sign on to Facebook, and it's not even clear which of them clicked the button to agree to the terms. Can I ask you, related to all this, about the separate attorney question? This does appear to be a situation in which you have two groups, at least whose interests and concerns, and for whom the legal surrounding material are very different. And the question is, really, at what point, what is the standard for when there is a requirement that there be separate representation? I mean, this sounds like a rather broad diversions of interests, whether it's a conflict of interest, I guess, is the question. How would you suggest we go about, what standard applies here? We believe the standard is that there needs to be a conflict of interest, and some courts have said there needs to be... A conflict of interest, I mean, that's a mushy concept here, because, to be specific, what you have is a dynamic in which one class, i.e. the adult group, may have a lot more interest in settling for a lot less, maybe, because they arguably have less in the way of legal background, or more legal risk and less legal liability, particularly as to the future. So, I mean, is that accurate? And if it's accurate, why isn't that enough of a conflict, i.e. they have different interests in whether to settle now or try to establish liability? I don't think this case falls into the Ortiz-Amkham framework. This court in Hanlon, the original settlement approval case at 150 F3rd 1020-21, made clear that there needs to be fundamental conflict of interest. I'm trying to put some teeth as to why that means. I don't think here there's any basis for concluding that the adult class had different interests than the minor class. Both were seeking compensation. They were bringing the same claim. It was exactly the same claim. It was a claim under 3344. Well, their claim was that they didn't consent, but the adult claim they didn't consent was simply that the consent language was fuzzy. The other one was that there were all kinds of reasons they couldn't consent. Right, but the minor class also had significant disabilities. There were serious defenses brought to the minor's parental consent claims. They were all different, right? The causes of action were different. Yes, they had different defenses, but there's no indication that there was any fundamental conflict of interest between the two classes. Conflict and divergence, those are two different words, and they really do mean different things, but to the extent that there's a diversion of interest, I can well understand how a plaintiff lawyer representing both classes simultaneously might be inclined to press harder for one thing that would advantage one group, or to press harder for the other, and I can see how the negotiations might work out differently if you've got different lawyers representing the adults and different lawyers representing the children. I just think that's a fairly self-evident proposition that it might turn out differently. Whether the divergence of interest is enough to warrant our sending it back to have subclasses required, that's a different question. Well, Your Honor, just to be clear, there were subclasses. The Court did certify a separate minor subclass and considered their interests separately. There was not separate counsel under Amcamp. That's my problem, there's no separate counsel. Who's representing whom? But counsel did secure substantial separate relief for the minor class. We believe the new provision... But as I look at that relief, the realistic consequence of saying to the kid, okay, when you click this, you represent that mom and dad have agreed, that strikes me as not providing much meaningful relief, and giving the option to the adults or the parents to come in that strikes me as likely not to produce a lot, some. It's more than there was before, and considering that the existing provisions were defended with substantial defenses to plaintiff's claim, we believe there's substantial relief, and the District Court found that the injunctive relief provided substantial relief to the minor class. I don't believe this Court can find that the judge abused its discretion in reaching that conclusion, which is ultimately the standard that this Court is applying. I'm going to let my... I'm looking at handling. You said there was a discussion in handling of the concept question. I can't find it. Do you know where it is? I believe, Your Honor, that it's at 150F3rd, page 1020-21. There's a discussion of differing interests. Now, that was an early case, and there's been a lot of case law since then, including the literary works case at the Second Circuit. Now, that's what my notes show. I can double-check that while we're sitting here, because I have the case at my table. Thanks very much. Now, you've got 3 minutes and 51 seconds on the clock, and in order to preserve peace between you and your... I'm not quite sure the right word in this circumstance is co-counsel, but let's put 7 minutes on the clock, please. Thank you, Your Honor. May it please the Court, my name is Robert Arns. I represent the Fraley, Mainzer, Tate, and Duval class. Now, if I could just say one thing. We took a lot of special care with the minor class, and one thing that is very important, we did 21 depositions in this case. We have over 3,000 pages of transcript in this case. Excuse me, 4,000 pages. One thing that was very important is we did all the expert depositions in this case. We basically had five expert depositions for the plaintiff, there were two for the defense, before the motion for class certification. The case went into settlement mode 48 hours before that motion was to be heard in front of Judge Lucy Koh. And what I want to say is a lot of the work done with the experts had to do with the minors also. Two of the three class reps were minors. There were two parents, thus, of the minors, well, including the husband and wife, four parents, that were monitoring this 100%. Now, with respect to comments that have been made that there's a release that's going to release someone that wasn't using Facebook during the class period, obviously the definition of the class is solely those people that were using Facebook and were in sponsored stories. Is the release prospective, i.e., prospective in the sense of relating to use after the settlement? No, Your Honor, no. There's no release of future claims? No, and this is solely a release. This is for class members? Right. This is solely a release for sponsored stories, and sponsored stories are a very small part of the Facebook advertising regime. Sponsored stories are only when there's a like that's already posted on the friends' pages. And, by the way, it exists in Facebook that if a Facebook member wants it to go to two members, wants it to go to one member, or 1,000 friends, they can do that. With respect to our injunctive, when a person signs up for Facebook, they state, let's talk about the teenagers for a moment, did your parents give consent for all advertising using your name and likeness? They have to click yes. With respect to are your parents on Facebook? I'm sorry to interrupt for just a minute. Does any of your expert testimony go to how likely it is that when the child checks this, the child will have read it? They did not address that, Your Honor. They did not address that. But, additionally, they have to check a box whether or not their parents are on Facebook. This is part of the injunctive relief now. If their parents are not on Facebook, they're automatically opted out. I thought the provision is that they can check a box that their parents are on. That's a one-way ratchet, that they can check a box that their parents are not on Facebook. Yes, that also, Your Honor. But that's different from they have to check. I mean, if you're saying that they have to check a box whether or not their parents are on, either way, but I don't think that's true. But they have to list their parent. They have to list who their parent is. And here's the situation. They do every time? No. No, Your Honor. Just when they're signing up. And, additionally, for those who are already members, they are recommended that they do this. So, thus, to respond to Judge Fletcher's question. I'm sorry. This is going to take a minute. I want to make sure I understand it precisely. So what does the box say with respect, when the minor signs in and is asked to check a box, precisely what is the question that the minor is being asked about the parent? It's not just a box for that question. Okay. But you have to list whether your parent is on Facebook. If not, you're automatically opted out. If your parent is on Facebook. No, no, no. Not whether. I mean, there is a difference, and I think you're alighting it. Am I wrong about that? Pardon me, Your Honor. I didn't hear that. My understanding from the settlement is that the box says, check this box if your parent is not on Facebook. That's correct. Not, is your parent on Facebook or not. That is correct. But what's correct? What you said first. All right. So, in other words, if they don't check anything, they do not come off, they continue to use Facebook. That's correct. But they are to list their parent who is on Facebook. Then, addressing Judge Fletcher's comment about what effect will this have. Well, I still need to understand exactly what happens. Okay. So there's a question. And the question asks what? Is your parent on Facebook? Okay. And if they check yes, what happens? Then they have a list of their family. You are answering two different things. Is the question, is your parent on Facebook, or is it check this box if your parent is not on Facebook? That's a difference. You know, I would look at the, I want to look at the injunctive to be exact. Oh, yeah, yeah. So I'd look at it. And we'll take as long as we need. But I think it has the same result. And then, as I'm looking at this, the point is then it is recommended that they list in their friend categories. First, let's get to the point of what precisely is the question. And then we can go. Confirmed parental relationships. New users upon soon adjoining Facebook to include in their profile information about their family, including their parents and children. So what they are to do is include if their parents are on Facebook in that situation. That's the only thing the injunction says? They're supposed to provide information? Yes. So there's nothing about box and specific question? That's correct. Oh, so all this talk about the specific question and the box is not right. Well, let's take a look. And it says where both the parent and minor child are users and confirm their relationship. So I don't know the exact how it's going to be laid out, Your Honor. We don't have the proof of that, what that's going to be. But it's an easy system for them to know whether or not their parents are on Facebook. Well, let me make it up then. I think it's consistent with what you're telling me. There's a question that says is either of your parents on Facebook? Yes. Yes or no. And there are two boxes. Okay. So they say yes. What happens then? Then it's recommended that you state who your parents are. Recommended or required? Recommended. So the kid does not have to name the parents? Does not. But if the parent is on Facebook, Your Honor, this is the point I wanted to make. Okay. So if the child says yes, my parents are on Facebook, but says nothing further, the child's allowed to go forward? That's correct. And if the child says yes, my parents are on Facebook and names the parents, then what happens? Then the parents get every one of the postings that can be boosted up to a sponsored story. And the parent is going to see everything that happens. Every parent I know who has a Facebook page and who has children, I have adult children and grandchildren who aren't on Facebook yet, but you can see every posting that is made by them, and parents want to see every posting that is made. If there's a youngster who – if there's a teenager who's on Facebook and there's a good parent, that good parent's going to want to see what every post is. And that's why we get – and so, Your Honor, to answer that question, if they don't list who their parent is as a friend, then the parent's going to say, hey, I want to see what you're posting on Facebook. Okay. So what happens if they say no, I don't have parents on Facebook? Then they're automatically opted out of all sponsored stories, cannot be used in that type of advertising. So if they say I don't have a parent on Facebook, that's automatic? Automatic opt-out of sponsored stories, Your Honor. All sponsored stories? Yes. And sponsored ads also? Sponsored stories. Now, sponsored ads, there's different types of terminology. This case dealt with sponsored stories, where there was solely the publication that occurred that was boosted up to adding a logo in the right-hand page. That was the sponsored story. There are Facebook ads with social content, which are a little different. This is what this group did to start with, and it's – the injunctive relief does say sponsored stories. So opted out of sponsored stories, Your Honor. And sponsored ads, that's left out of the injunction? Well, it depends on what's meant by sponsored ads, Your Honor, because I don't really know the term sponsored ads. They're going to get ads sent to them because that's not a sponsored story. So is their name and likeness going to be used in any other manner? Not if it looks like a duck, quacks like a duck, and it's a sponsored story. But again, that is the parameters of this lawsuit, was sponsored stories. It was very specific. And just to make a couple other comments, because we had two minor class reps, and I know my time is up, Your Honor, if I could just make this my last comment. A great deal of the focus of the case was with respect to the minors. We knew, and it was this group that had a decision in Southern California. Judge Deborah Weintraub, that said COPPA totally preempted state law, and the minors did not have a claim. They then very smartly had that case dismissed. It's in the record, Your Honor. But that was hanging out there altogether. Now, the FTC and the Attorney General has requested, please don't make a decision that COPPA preempts state law. We hope you don't, Your Honors. We hope you don't, because we fought that all the way through. There were many spectras of issues. One that hasn't been mentioned, the minors, we found out, very often use pseudonyms. They use different names. Jimmy Smith could end up being Big Jim, and then the profile picture is Mount Everest. As a matter of fact, they change their names all the time. We faced all these issues because we did this discovery. We had 200,000 pages of documents, Your Honor. And again, when you talk about being able to see how Facebook operates, we can look at that any time we want. So the final comment I would like to make, we are very proud of this settlement. We think it accomplished a great deal. We believe the injunctive relief is very robust. At any rate, thank you very much, Your Honors. Now you had sought to save five minutes, and we took everybody over. Let's put five minutes on the clock. Are you going to do the entire rebuttal? Yes, Your Honor. And thank you for the five minutes. I'd like to begin by clearing up a couple of points that came up in opposing counsel's argument. First, there was the notion that Facebook requires children to identify their parents. That is not correct. On ER 32, Settlement Section 2.1c sub 2, what Mr. Arns left out of his quote was that Facebook will encourage new users upon or soon after joining Facebook to include in their profile information on their family, including their parents and children. Well, I did not hear him say that the children were required. Okay. Okay. I wanted to clear that up. I'm not sure he used the word encourage, but I know he said they were not required. Okay. And with respect to this notion that if their parents aren't on Facebook, they're automatically barred from using the sponsored stories, the question that is asked is tell us if your parents aren't on Facebook, check here. Is that what it is? Or is it are your parents on Facebook or aren't they or what? Do you know? I don't know that. That's not on the record here, unfortunately. I also would like to make a distinction between sponsored stories and other types of ads. Mr. Arns points out that this lawsuit was about sponsored stories. What's interesting is that the safeguards all pertain to sponsored stories, the fact that you can have a confirmed parental relationship and the parents can opt you out, but they don't apply to all sponsored ads. Now, as we pointed out in our brief and as — But the lawsuit wasn't about that. Well, but the terms of service notably are broader. What's in 2.1A, the new terms of use — That's true, but it's just not what this lawsuit is about. They'll bring a different case. Well, but Judge Berzon, hear me out on this one, because the revisions to the terms of use apply — say that if you're under 18, you represent that at least one of your parents or legal guardians has also agreed to the terms of this section and the use of your name, profile picture, content, and information. So even though the safeguards pertain to sponsored stories, the permission that Facebook is purporting to get from the minors on behalf of their parents or representing their parents is broader than that. It applies to any sponsored ad, and in fact — After the issuance of this injunction, was there any protection whatsoever with respect to representation of parental agreement? No, Your Honor, and that's why there was a lawsuit. Well, no, but I think you're complaining that the injunction doesn't go far enough. It sounds as though the injunction may be somewhat ineffectual, but it's more than there was before because there was nothing before. I think it's entirely ineffectual, Your Honor. I think — No, take my point. That is to say there was nothing before with respect to sponsored ads. There is nothing before. That's correct. But the injunctive relief is so weak here as — Well, basically, I mean, the reason it's weak is because kids are going to lie. Is that really what it amounts to? I.e., they're going to say I have parental consent when they don't have parental consent. And they're going to say whatever this thing says about my parents are on Facebook or are on Facebook. They're not going to tell the truth about that. That has to be the concern, right? It's weak because they could lie. It's weak because they could not read it. And it's also weak because the laws of the seven states that we've cited require affirmative parental consent, many of them say in writing or prior or express. And the child's representation — So isn't the net result of this that kids can't use Facebook? No. There would be a very easy way to fix this problem with respect to minors. And that would be if it were an opt-in regime instead of an opt-out regime of just for the minors for these ads. But nobody pushed for that. And that gets to the conflict point. But you still have the parental consent problem in this atmosphere unlike any other in which you have faceless people and some kid is sitting there and he says, okay, I opt-in. Then what? Well, no, but you would have the parent opt-in. Right. And he says, well, my parent says I opt-in. So now you have to go find the parent somewhere. Well, no, you'd actually have — And how does Facebook have any idea of who that's his parent? He says, okay, my parent's — he sends his friend. He says, hey, you're my parent and opts in. Well, I think that would get to — I mean, at some point I think Facebook is entitled to rely on representation. But they're not even trying to get the parent's permission before they do this. And that goes to the conflict because if counsel had truly taken into account everyone's interests here, the money versus the injunction, they would have seen that the adults are more interested in the money. The children really need the protection of the injunction. And maybe if counsel had been representing the children, been thinking about the children, they would have held out for a better deal or for an opt-in relationship. There was a conflict that was, in the court's words, fundamental because there were these two different parts of the settlement that were essentially in conflict, that there had to be a tradeoff. Not money, as in Amchem, but this weak injunctive relief for Facebook to pay $20 million into a settlement fund. Well, the only problem with that representation is that, in fact, the original settlement didn't have the monetary relief, and the judge just approved it. Yes, the judge actually required it to be improved on a number of fronts. It did add the monetary relief, but he also asked for the parties to address, quite rightly, to address the interests of the minors. And if you go back and look at the settlement that was disapproved, it's very similar, as to the injunctive relief. Well, I suppose that that's, in a way, a proof that the system worked, i.e., in the sense that the judge was there and the judge was able to rebalance if there was an imbalance with regard to how the different groups were treated. But what the judge overlooked and what no separate counsel was there to say is this settlement does not protect the interests of minors. It is illegal as to them, and going forward, children and their parents will not be able to sue because of Section 716 that says this is going to be a complete defense, even though the release doesn't go forward, as opposing counsel noted. It did. It was a little disturbing. Somebody told me it did, because I asked that question before. I'm sorry, Your Honor? I asked the question before of whether there was a waiver of future claims with regard to post-settlement incidents, and I was told yes, and now I'm told no, which is right. There is, but there are two different provisions, Your Honor. At ER44, you have the release. The release, it's in Section 5.2 of the settlement. Right. This is Schachter's ER 5.2. Right. That is not a future release. We grant that, and I believe that's what opposing counsel was talking about. But flip four pages ahead and look to Section 7.16, which states on ER 48 that the settlement agreement may be pled as a full and complete defense to any action, suit, or proceeding. But that's standard California language, and all it means is that whatever the settlement means, I can use it as a defense and I can bring an injunction, but it doesn't add to the settlement. But what it does show is that it ends with any other proceedings that may be instituted, prosecuted, or attempted in breach of or contrary to this settlement. It is contrary to this settlement to say that, for instance, the child's representation of parental consent is not the same as parental consent. Facebook under this settlement is permitted to use the child's representation in place of the actual parent, and that's not what those seven state laws are. The settlement doesn't say this is legal. It says this is what we're going to do. Yes, but the case law says that part of being fair, adequate, and reasonable is also being legal. And I don't think this court should go against the weight of authority in the appellate courts against your own decision in Sierra Club versus Elector Controls, which we cited, about the related context of consent decrees and say that district courts are okay to approve settlements authorizing the violation of law. Okay. Thank you very much. And we appreciate your indulgement as to the extra time. Frehley, et cetera, now submitted for decision. We've got one last. It is kind of a subdivision of the case, and that's Frehley versus Kazman. May it please the Court, Theodore H. Frank of the Nonprofit Center for Class Action and Fairness for Appellant Sam Kazman. It didn't come up in the previous oral argument, but the Lally 28J pointing out the Cypre decisions of the Seventh and Eighth Circuits create a problem for the settlement approval in this case, which might moot our attorney fee claim, and that's Pearson 772 F3rd 778 and the Bank of America Securities case 775 F3rd 1060. But to the extent that this Court does reach the attorney fee issue for the objectors or for Mr. Kazman's attorney's fees, the district court committed reversible error in terms of the standard of legal, the standard of law it applied in deciding whether to award fees. Are you saying that the district court committed abuse of discretion by not following the law as to whether to use Cypre or not? The district court should have followed Section 3.07 of the ALI principles, and that's the argument that Batman and Lally made in their briefs and that the Seventh and Eighth Circuits have adopted. Because there was no reason to use Cypre here, there should have been a greater distribution to the persons who made claims? Either that or an effort to increase the number of claims made, given that there are 100 million class members and less than 1% of the class made claims here. Do you want to talk about that or you don't want to talk about the fees? I'll talk about whatever the Court wants me to talk about, Your Honor. You don't want to talk about the fees, which is why we gave you extra time. Absolutely, Your Honor. With regard to the Cypre issue, it seems to me this is a very different circumstance because no matter if you gave all of the money in the pot to the class, you still wouldn't have enough money to induce claims, right? Because the number is going to be small. So it seems to me what you're doing with the Cypre is you're providing some relief to the people who didn't make the claims because the amount of money was too small. Well, again, that goes against what the 7th and 8th Circuit said about the issue. Well, at that time it doesn't really matter. The question is for our decision-making. I don't think it does go against you because they weren't facing a situation like that of extremely small amounts of money. But even if they were, I don't see why I'm trying to come to the right rule, and the right rule, it seems to me, would be that if you have a situation where the number of claims is going to be small no matter what you do, therefore giving Cypre relief to closely related organizations, which these were. I mean, you don't have a problem in that regard. It's providing some relief to the people who didn't make the claims for understandable reasons. Well, I would disagree that it was any smaller here than in the 7th Circuit, where it's $1.1 million out of a class of $13 million, and in the 8th Circuit where it's a $2.7 million pot where the court said, well, the class would be better off if it goes to this legal aid charity than if it goes to the wealthy mutual funds that aren't tied to the money. I'm not talking about the class. Here the money was available to the class. They didn't make the claims for understandable reasons. And by having the Cypre available, you're essentially providing relief to the people who for understandable reasons didn't make the claims. At the cost of people who did make claims and who have the better claim on the money. $3 more. So why isn't that a fair balance? Well, the problem there is that when you incentivize the attorneys to favor third parties over their own class members, they're going to agree to claims processes and other things that end up steering the money to their friends in Cypre situations rather than to the class members. But there's no indication that these were their friends or that they were anything but directly pertinent organizations. Well, in this particular case, no. But say in Easy Saver Rewards or in Chaos versus Google. But we only have this particular case in front of us. Well, but if you have a bright line rule, you avoid having to go into that inquiry is the problem. You owe a duty to your clients, which are the class members. And the minute you say, well, it's okay if it goes to Cypre because... I just find it really hard to think that they would be benefiting their class members more by giving a very small fraction of the class $3 more rather than providing a reasonable amount of money to entities that are going to work on the problems that generate the lawsuit. Well, by that argument, then you should never pay the class members. You should just go and find the best way to give money to the world. Don't turn that into a reductive observation. Do you want to talk about fees? I'll talk about fees. The district court erred in terms of requiring us, an objector, to guess in advance what the district court was going to do for something it had preliminarily approved. And as Dissner says at 759-60, as the Reynolds v. Beneficial case says, you can't require the objectors to guess in advance. When the judge preliminary approves something, you have to assume that he's going to approve the settlement that he's preliminarily approved unless you come in and object. And going in, you don't know what the judge is going to do. You don't know that the parties might change the objection. The problem here is that you had lots of objectors, so therefore attributing anything to a single objector is a little difficult. That would be the case to say if there were nine other objectors here saying, no, it was our objection that caused the fees or caused the changes in the settlement. But there's no dispute that we filed a substantive objection, that the other side focused their response to responding to our objection, that no other party, no other objector said, wait, this wasn't Kasman who did this, this was us who did it. There's nobody plausibly arguing that we had a duplicative objection. Facebook opposed the attorney's fees. They didn't even make the arguments that we made and that the court adopted. Yet the court said, I'm not crediting you because this was just common sense and I would have done it anyway. You're now talking about the $300,000. Both the $300,000 and the $2.5 million augmentation, that was not noticed to the class and that was decided after we objected and said far too much of this is going to side prey under the baby products case. And to either forestall the objection to the baby products, they raised it and then made the self-serving comment, well, we were going to do that anyway. Okay, let's hear from the other side. Thank you, Your Honor. Police Court, Robert Ahrens for the class. By the way, just one housekeeping item. We found the paragraph with respect to the new control. It says, finally, Facebook will add a control in the minor's user's profile, which enables that minor user to indicate that his or her parents are not on Facebook. I understand that. I've read that and I understand that. You only say if your parents are not on Facebook. That's correct. That's why I was asking the question. We didn't have that draft developed at this time. Fine. So thank you, Your Honor. With respect to the side prey, we know that the expert witnesses testified that the loss to the class, actually the money that was generated, I should say, by Facebook for sponsored stories was between $0.94 and $1.45 for people who were used in sponsored stories. Now, we felt it important to use the side prey. Your Netflix decision, the Ninth Circuit Netflix decision, makes very clear that if there's a large class there in Netflix, there were 65 million people and the settlement fund was $9 million. That was 100% side prey and was approved because the amount that would be paid to the class would be not a great amount of money. So just in responding to side prey, those two new cases that counsel sent in are completely distinguishable. In one of them, the side prey, the Bank of America case, the side prey went to the legal aid society of East Missouri, even though it was a national class. Completely different circumstance. In the Pearson case, there was a total of $865,000 to class members and $1.9 million went to counsel and $1.3 million to side prey. Those cases don't apply the slightest bit. With respect to Mr. Kazman, he claims that the district court abused its discretion when it declined him attorney's fees for his overruled objections. Before we get on, the side prey doctrine bothers me a little bit because it's usually applied where there's insufficient funds to pay out to the whole class or the payment of the class would be so expensive as to exhaust all the funds. But here it seems very, very simple. We're talking about an additional $7 to the persons who made claims. They went from 10 to 15. And the question was, why not go to 22 to the claimants? And as I read Judge Seberg's determination of that, he said, well, it wouldn't be fair. It wouldn't be fair. I don't understand that the side prey doctrine requires the intuitive, subjective, and unexpressed content of a district judge as to what is fair. It applies only when the distribution of the sums are impossible or difficult to do because of the size of the class. I don't see why side prey applies here at all. I think it's a misuse of the side prey doctrine, and you should have sent $7 more to all the people who made claims. Judge Bain, if I could respond to that. As you know, the claims went from 10 to 15. And would it have been $7 more? I don't know if that's accurate. But in this case, we totally vetted the side prey recipients in the notices, and we told the class members that we have these side prey recipients. And we advocated, Facebook advocated, and the judge agreed that it would be unfair that the non-claimant class members may have been non-claimants because they chose to let the side prey. Did you have an expert witness who said, I am a psychologist of claimants, and I can tell you that if they only get $10, they won't make a claim, but if they get $22, they will make a claim? Is there any evidence of that? There was not. Where did the judge get this idea? Simply in the notice process, Your Honor. The notice process named the side prey recipients. It's a real problem, really the opposite, that at 10, 15, or 22, only very motivated people are going to make claims. And I can't imagine anybody who wouldn't make a claim at 10 would have made it at 22. Instead, it seems to me the problem is that those people are not getting anything out of this settlement if all the money goes to the few people who want $22. So that's what the side prey is about. That's correct, Your Honor. But that's not what Judge Breyer said, particularly. Well, those were the arguments that we submitted that we felt like the Netflix decision, the Ninth Circuit Netflix decision, that this was a case that would be appropriate, Judge, for side prey so that every member of the class would have that benefit. Now, I know that I'm out of time, but if I could just make one comment. You've got one minute and 24 seconds. Oh, very good. Thank you, Your Honor. I thought it turned red. Basically, Mr. Frank wants to change a rule that would be a serial objector's dream that takes the power out of the district court to say, there's no record that allowed your one paragraph to change my mind about anything. And I don't want to cast any aspersions. One paragraph about fees altogether or one paragraph about where the costs come out? The costs, yes. That's what the order said, Your Honor. And, you know, if I can just make one comment. As a plaintiff's attorney all my life, taking all the risk in every case, funding every case, never having a bank loan on any case, and the objectors come in with no skin in the game and now want to have a situation where automatically the discretion of the district court is taken away, and that's the rule that he wants to have developed here. And all I can say is I would implore the court not to invoke that doctrine. Exactly what happened here. There was the fees originally were in the agreement, and then they came out of the agreement in the sense that Facebook could object to them. I gather Facebook didn't object to this particular thing, but that doesn't mean the district court wouldn't have reached it on its own, right? Correct, Your Honor. What did the district court say about it? Did he say, I would have done it anyway? Nothing in this. Are we talking about the net engross, the 25% on net engross? Yes. The court just says that's common sense. It was so common sense, why wasn't it in the preliminary, why wasn't it in the agreement that the preliminary approval was given? That was a gross. That was gross, yes, Your Honor. So common sense, he lost his common sense? Well, Your Honor. He didn't have his common sense until there was an objection. That's the but-for argument here, right? That would be the argument that was made. Was there any other basis that the judge gave for arriving at his common sense other than the objection which Mr. Kasman made? Judge Seaborg was very conservative with the funds in this case. For example, the class representatives who all did seven-hour depositions, who all spent a lot of time, who we spoke with constantly, got a $1,500 service award. That was Judge Seaborg's decision. Judge Seaborg was conservative on the attorney's fees, Your Honor, and used the net as opposed to gross, and we never came back and we aren't appealing any of that. Was there an oral argument on the objections in which this issue was raised verbally? Yes, there was an oral argument, Your Honor, and I don't remember if that subject was really brought up. I know that I discussed it with his Honor, and we had a situation where our lodestar was higher than ultimately what ended up. Judge Bey, as a matter of fact, our lodestar was 5.4. We spent thousands of hours on this case, as I told you, maximum amount of discovery. This case was ready to go to trial, actually, but at any rate, I note that I'm over. Thank you very much, Your Honors. One minute. Very quickly, one reason that there are so few claims was because the claims process was structured in a way to throttle the number of claims, and that's at page 93 of the record. I'm a class member. I couldn't make a claim in this case because I would have had to perjure myself to claim the $10 or $15. You had to affirm four specific things, and I couldn't affirm all four specific things even though I was a class member and I was bound. We had more than a paragraph on the net versus gross. It was two or three pages in our brief, and aside from the fact that you can't just go into the court and submit two or three pages, you have to do the workup of the entire objection, prove the class membership, do all the things to avoid getting your class member deposed to demonstrate that he's a class member, show up at the fairness hearing to make the argument. So that, again — Did you, by the way, make this argument verbally, make the argument about the cost? We were not given the opportunity because we were time-limited and we focused on Cyprea. So you didn't. Okay. Okay. Thank you. Thank you. The case just argued is now submitted, and we're adjourned until tomorrow. Thank you.
judges: Fletcher, Berzon, Bea